**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

_____
                                                              )
NATHAN WRIGHT and                          )
CAMESE BEDFORD, on behalf of          )
themselves and others similarly situated,   )
                                                              )
        Plaintiffs,                                      )
                                                              )
        v.                                                  )          Case. No. 4:19-cv-398
                                                              )
FAMILY SUPPORT DIVISION of the       )          CLASS ACTION
Missouri Department of Social Services;    )          JURY DEMANDED
MICHAEL PARSON, in his official          )
capacity as Governor of Missouri;            )
STEVE CORSI, in his official capacity      )
as Director of the Missouri Department of  )
Social Services;                                        )
PATRICK LUEBBERING, in his official    )
capacity as Director of the Family Support )
Division;                                                 )
JOEL WALTER, in his official capacity    )
as Director of the Department of Revenue; )
JACKIE BEMBOOM, in her official         )
capacity as Director of the Motor Vehicle  )
and Driver Licensing Division,                 )
                                                              )
        Defendants.                                     )
_____)

## Introduction

1.      This case is about the Missouri Department of Social Services' Family Support

Division and the Missouri Department of Revenue perpetuating a cycle of poverty by

unconstitutionally suspending the driver's licenses of parents who are unable to pay child support.

Under Missouri law, the Family Support Division (FSD) has the authority to issue an order

suspending the driver's license of any person who owes at least three months' worth of child

support payments or at least $2,500, whichever is less.  These suspensions are meant to coerce

1

payment, but for those who cannot pay, the loss of a driver's license counterproductively decreases the likelihood that a person will be able to pay child support, as it often leads to job loss, reduced employment opportunities, eviction, and greater difficulty carrying out the responsibilities of everyday life.

2.      Moreover, suspending the driver's licenses of non-custodial parents makes it more difficult for them to see their children regularly, pick them up for visitation, or share in caring for them by taking them to doctor's appointments and participating in school activities.  Thus, these license suspensions harm the interests of the children who are ostensibly meant to benefit from child support enforcement by making it virtually impossible for non-custodial parents with limited means to play a meaningful role in their children's lives as well as ensuring that parents are unable to earn the money that they would gladly use to support their children.

3.      Many parents whose licenses are suspended face an impossible choice: comply with the suspensions and lose their jobs, homes, and ability to care for their families, or drive illegally and face the threat of further debt and criminal charges if they are caught.

4.      License suspension as a debt collection method is unconstitutional and irrational when enforced against people who cannot afford to pay: no amount of coercion can force money out of a person who has none.  Missouri's FSD traps parents in an inescapable cycle of poverty and criminal culpability by suspending their driver's licenses.

5.      FSD's lack of ability-to-pay hearings, failure to provide competent responses to requests for reinstatement, and overall lack of accountability robs non-custodial parents of their ability to drive, thus severely hampering their ability to earn a living, provide for their children, and secure their families' wellbeing.

2

6.      Suspending the licenses of parents who are unable to pay child support violates their substantive due process, equal protection, and procedural due process rights under the United States Constitution.

7.      By and through their attorneys, on behalf of themselves and all others similarly situated, Plaintiffs Nathan Wright and Camese Bedford seek declaratory and injunctive relief against Defendants in their official capacities to end this unconstitutional wealth-based suspension scheme.

**Nature of the Action**

8.      Defendants routinely suspend the driver's licenses of parents who fail to pay child support, even if nonpayment is non-willful.  Plaintiffs seek declaratory and injunctive relief prohibiting these suspensions.

9.      Because Defendants enforce license suspensions as penalties for nonpayment with no indigence exception, the suspensions amount to wealth-based discrimination in violation of substantive due process and equal protection rights.

10.     Because Defendants enforce a complete deprivation against parents who are completely unable to satisfy their child support requirements, affected parents are a suspect class, and Defendants' discrimination violates equal protection rights, as it is not narrowly tailored to a compelling government interest.

11.     Because license suspension impedes parents' ability to travel without being narrowly tailored to a government interest, the suspensions violate substantive due process rights.

12.     Because Defendants deprive parents of their property interest in their driver's licenses without a meaningful hearing — that is, a pre-deprivation ability-to-pay hearing determining whether nonpayment was willful — or notice of such a hearing, the suspensions violate procedural due process rights.

## Jurisdiction and Venue

13.     This is a civil rights action arising under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, *et seq.*, and the Fourteenth Amendment to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

14.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Parties

15.     Plaintiff Nathan Wright is a 39-year-old resident of Farmington, Missouri.  Ex. 1, Wright Decl.  Mr. Wright currently owes approximately $30,000 in arrears for support of his daughter, who is now nineteen years old.  Mr. Wright is unable to pay off his arrears.  As a result of his inability to pay, Defendants suspended his driver's license on May 24, 2018.  Ex. 2, Wright Driver Record.  Mr. Wright has custody of his two younger children, ages nine and four, and he is their sole provider and caretaker.  Ex. 1, Wright Decl.

16.     Plaintiff Camese Bedford is a 31-year-old navy veteran and a resident of St. Louis, Missouri.  Ex. 3, Bedford Decl.  Mr. Bedford's driver's license was suspended on February 25, 2017 because he owes over $2,500 in child support arrears that he cannot pay.  Ex. 4, Bedford Driver Record.  Mr. Bedford is currently unemployed, and his only income is the $140 he receives monthly in disability benefits, which covers only a fraction of his monthly expenses.  Mr. Bedford's license suspension has made it impossible for him to see his six-year-old daughter regularly.  Ex. 3, Bedford Decl.

17.     Defendant Family Support Division ("FSD") is a division within the Department of Social Services charged with "administer[ing] the state plan for child support enforcement." MO Rev. Stat. § 454.400.  Under Missouri Revised Statute § 454.400.2(1), FSD can "be sued" as the division of child support enforcement.

18.     Defendant Michael L. Parson is the Governor of Missouri.  As Governor, Mr. Parson is the head of the executive branch of the Missouri state government and is responsible for enforcing state law, including Missouri Revised Statute § 454.1003.1, which authorizes the FSD director to suspend the driver's licenses of parents who fail to pay child support.  Mr. Parson is sued in his official capacity as Governor.

19.     Defendant Steve Corsi is the Director of Missouri's Department of Social Services. The Department is responsible for "coordinating programs to provide public assistance to children and their parents," including child support enforcement.[1]  Mr. Corsi is sued in his official capacity as Director of the Department of Social Services.

20.     Defendant Patrick Luebbering is the Director of the Family Support Division of Missouri's Department of Social Services.  Under Missouri Revised Statute § 454.1003.1, "the director of the division of child support enforcement [FSD] may issue an order . . . suspending an obligor's license and ordering the obligor to refrain from engaging in a licensed activity (1) [w]hen the obligor is not making child support payments in accordance with a support order and owes an arrearage in an amount greater than or equal to three months support payments or two thousand five hundred dollars, whichever is less, as of the date of service of a notice of intent to suspend such license."  Mr. Luebbering is sued in his official capacity as Director of the Family Support Division.

21.     Defendant Joel Walters is the Director of Missouri's Department of Revenue, which houses Missouri's Motor Vehicle and Licensing Division.  Mr. Walters is sued in his official capacity as Director of the Department of Revenue.

---

[1] *Office of the Director*, Missouri Department of Social Services, https://dss.mo.gov/ddo/ (last visited Mar. 4, 2019).

22.     Defendant Jackie Bemboom is the Director of the Motor Vehicle and Driver Licensing Division, which is part of the Department of Revenue.  Ms. Bemboom oversees the Driver License Bureau which "issues, renews, suspends, revokes, and reinstates driver and nondriver licenses and driving permits."[2]  She is sued in her official capacity as Director of the Motor Vehicle and Driver Licensing Division.

23.     At all times relevant to the events, acts, and/or omissions alleged in this Complaint, Defendants have acted under color of state law, pursuant to their authority and responsibilities as officials of the State of Missouri.

## Factual Background

### I.     Introduction

24.     The Family Support Division of Missouri's Department of Social Services ("FSD") orders the suspension of the driver's licenses of non-custodial parents who are not making child support payments and whose arrears total either three months' payments or $2,500, whichever is less.  MO Rev. Stat. § 454.1003.1(1).

25.     FSD makes no inquiry into the reason for nonpayment before ordering these suspensions; there is no exception for parents who failed to pay because they could not afford their payments.  There is no hearing to determine whether nonpayment was willful, and no notice is sent to parents informing them that they can contest suspension based on inability to pay.

26.     The loss of a driver's license only makes indigent parents less able to meet their child support obligations and less able to participate in their children's lives and share in parenting responsibilities.

---

[2]*Motor Vehicle and Driver Licensing Division*, Missouri Department of Revenue, https://www.mo.gov/government/guide-to-missouris-government/department-of-revenue/   (last visited Mar. 4, 2019).

## II.      Mr. Wright's Arrears and Suspension

27.      Nathan Wright is a 39-year-old resident of Farmington, Missouri.  He is a single father and the sole provider for his two younger children, ages nine and four.  Ex. 1, Wright Decl.

28.      Mr. Wright also has a nineteen-year-old daughter who was in her mother's custody when she was a minor.  In 2006, Mr. Wright was ordered to pay $900 per month in child support for his daughter.  After hiring a lawyer and spending a lot of time and money, Mr. Wright eventually managed to get his payment amount reduced to $509.  He has not been able to afford these payments, even at the reduced amount.  *Id.*

29.      Mr. Wright currently owes over $30,000 in arrears.  He has not been able to make a payment since April of 2018.  *Id.*

30.      Because of his unpaid child support, Defendants suspended Mr. Wright's license on May 24, 2018.  *Id.*; *see also* Ex. 2, Wright Driver Record.

31.      Prior to suspending Mr. Wright's license, FSD sent him a letter informing him that his license would be suspended if he did not either pay off his arrears or enter into a payment plan.  Mr. Wright could not afford to pay off the arrears, so he called FSD to try to set up a payment plan.  He was told that his only option was to pay his regular court-ordered payments of $509 per month.  FSD did not offer Mr. Wright any option for making smaller payments to avoid license suspension. Ex. 1, Wright Decl.

32.      Since Mr. Wright's divorce from his most recent wife in April of 2018, there has been no one to help him care for his two younger children.  As a result, he has been forced to cut back on his work hours so that he can take his kids to school and daycare and be available to pick them up at the end of the day.  *Id.*

33.      Mr. Wright has to drop off his four-year-old daughter around 8:00am and be back in Farmington by 3:00pm to pick up the kids from school.  Because the drive to St. Louis is an

hour-and-a-half long, Mr. Wright only has about four hours each day when he is actually able to be working. He also is at a disadvantage because most of the jobs in his field begin around 6:00am, but he is not available to start any jobs until 9:30am at the earliest. *Id.*

34.     When he was married and able to work more hours while his wife cared for the children, Mr. Wright worked for a union and earned about $40,000 per year. Now that he works fewer hours, he is self-employed and his income has been reduced to about $20,000 to $30,000 per year. This income change impacted Mr. Wright's ability to make payments on his arrears, and he has not been able to make a payment since his divorce. *Id.*

35.     All of Mr. Wright's income goes toward his and his children's living expenses. He has to pay about $400 per month for daycare, $550 in rent, and $200 in utilities. He also spends about $500 per month on groceries and about $600-$800 on gas and various needs for the children. Mr. Wright does not receive any support from his younger children's mother. Often, Mr. Wright's expenses exceed his income. For this reason, he has no savings and is not able to save any money. *Id.*

36.     Mr. Wright had no choice but to continue driving once his license was suspended. He is a self-employed contractor who does painting and dry-walling jobs in St. Louis, an hour-and-a-half drive from his home in Farmington. He has to haul all his painting and dry-walling equipment with him to jobs, including large items such as scaffolding, ladders, and benches. *Id.*

37.     Mr. Wright also needs to drive to carry out his many childcare responsibilities. His four-year-old daughter's daycare is ten miles from their house. His children's doctors are a 40-minute drive away, and the nearest grocery store is ten miles away. Mr. Wright and his children live outside the city of Farmington and must drive at least ten miles into town whenever they need anything. Mr. Wright's nine-year-old son plays for a travel football and soccer team that Mr.

Wright helps coach.  There is no one else available to drive the boy to and from practices, and the games are usually about an hour's drive from Farmington.  *Id.*

38.     Driving on a suspended license presents a significant risk for Mr. Wright.  If he is caught, he could face criminal charges.  MO Rev. Stat. § 302.321; *see also* Ex. 1, Wright Decl.

39.     Mr. Wright has a Class D felony on his record from 2008 for criminal nonpayment of child support.[3]  He has never been charged with any other crime.  There is a warrant out for his arrest for his criminal nonpayment.  If he is ever pulled over, he will likely be arrested.  This is a terrifying prospect because if Mr. Wright is jailed, there will be no one available to care for his two young children, since their mother is currently in jail and struggles with a drug addiction.  Ex. 1, Wright Decl.

40.     Mr. Wright tried to work with the St. Charles County prosecutor to have the warrant lifted, but he was told that he would have to pay $3,600 just to get the warrant lifted.  He cannot possibly afford to pay that amount.  *Id.*

## III.    Mr. Bedford's Arrears and Suspension

41.     Camese Bedford is a 31-year-old resident of St. Louis, Missouri.  He is a veteran of the United States Navy and served in the Second Gulf War.  Ex. 3, Bedford Decl.

42.     Mr. Bedford currently owes $2,851 in child support arrears.  Ex. 5, Bedford Payment Information.

---

[3] Under MO Rev. Stat. section 568.040(5), "[t]he offense of criminal nonsupport is a class A misdemeanor, unless the total arrearage is in excess of an aggregate of twelve monthly payments due under any order of support issued by any court of competent jurisdiction or any authorized administrative agency, in which case it is a class E felony."  Mr. Wright was charged with a class D felony because his offense of nonsupport with a total arrearage in excess of an aggregate of twelve monthly payments predated the Missouri legislature's downgrading of the offense from a class D to a class E felony, which became effective on January 1, 2017.  Crimes and Offenses—Rules and Regulations, 2014 Mo. Legis. Serv. S.B. 491 (Vernon's) (West's No. 9).

43.     Mr. Bedford found out around August of 2017 that his driver's license was suspended because he had failed to pay child support for his six-year-old daughter, who lives with Mr. Bedford's ex-wife.  He does not recall ever receiving a suspension notice in the mail.  *Id.*

44.     Until that time, Mr. Bedford had not realized that he was supposed to be making child support payments.  He found out when he received a letter informing him that there was a warrant out for his arrest because of nonpayment of child support.  When he called the number provided, he was informed that he was supposed to be paying $278 per month and that he owed at least $2,500 in arrears.  He also found out that as a result of his nonpayment, he had been charged with a class A misdemeanor.  *Id.*

45.     Mr. Bedford had not realized that he was supposed to be making child support payments because the order was made as a default judgment against him when he did not attend his divorce proceedings.  He did not attend because he was still hoping that he and his then-wife could work out their differences and avoid divorce.  *Id.*

46.     Mr. Bedford was told that his license would not be reinstated until he paid off all his arrears.  *Id.*

47.     Mr. Bedford is indigent and cannot afford to pay off his arrears.  He cannot even afford his everyday necessities.  He is currently unemployed, and his only income is the $140 he receives monthly in disability benefits, which barely covers half his rent ($278 per month), let alone his utilities ($50 per month), phone bill ($86 per month), and other household expenses such as food and supplies ($120 per month).  In fact, Mr. Bedford is often hungry because he cannot afford to feed himself properly.  *Id.*

48.     Mr. Bedford's monthly child support obligation was reduced in January of 2019 to $194, which includes a payment toward his arrears.  He made his payment in February of 2019, but at his current income level, he will not be able to make regular payments going forward.  *Id.*

49.     Mr. Bedford's last steady job was as an apprentice gardener with a Veterans Affairs medical facility.  He started working there in 2017, but in June of 2018, he was involved in a work-related car accident and had to stop working due to his injuries.  *Id.*

50.     Mr. Bedford also used to receive $1,097 per month from the VA, but the VA stopped these payments in December of 2018 when they realized that he was no longer married.  Mr. Bedford has filed a correction of his marital status, but he does not know whether or when he will receive support from the VA again.  *Id.*

51.     Currently, because he is unemployed and no longer receives support from the VA, Mr. Bedford's only income is the $140 in disability that he receives for a medical condition he suffered as a result of his navy service.  *Id.*

52.     Mr. Bedford's lack of a valid driver's license severely limits his job prospects, which are already limited due to a shoulder injury that prevents him from lifting heavy loads.  *Id.*

53.     Mr. Bedford can only take jobs within walking distance of his home because he cannot drive and cannot always afford bus fare.  He worked at Family Dollar for a short time recently, but he was only able to keep the job for about three weeks because he could not afford bus fare to get there every day reliably.  *Id.*

54.     Walking is also difficult for Mr. Bedford.  He has a skin condition on his feet that started during his navy service.  It is painful and makes it uncomfortable for him to walk long distances.  *Id.*

55.     Mr. Bedford has experienced homelessness in the past, and with his income severely affected by his driver's license suspension, he worries that he will soon become homeless again. *Id.*

56.     Mr. Bedford does not own a car, but he was planning to purchase one until he found out his license was suspended.  If his license were not suspended, he would rent or lease a car to go to work and to see his daughter regularly. *Id.*

57.     Not being able to drive makes it very difficult for Mr. Bedford to see his six-year-old daughter.  Under his new child support agreement, he is entitled to overnight visitation with his daughter every weekend.  But most weekends, Mr. Bedford's inability to drive makes seeing his daughter impossible. *Id.*

58.     Mr. Bedford's daughter lives with her mother, about a 40-minute drive from Mr. Bedford's home.  By bus, the trip takes two hours.  Often, Mr. Bedford is unable to pick his daughter up for their visits because he cannot afford bus fare.  Additionally, the buses run less often and on a shorter schedule on the weekends, and Mr. Bedford worries that it is too cold outside in the winter for his young daughter to be waiting at the bus stop with him for long periods of time. *Id.*

59.     Due to his transportation challenges, Mr. Bedford has not seen his daughter at all for about a month.  Most of their communication is over the phone. *Id.*

60.     Being a father to his six-year-old daughter means everything to Mr. Bedford.  He is extremely concerned about the effect that his physical absence has on her wellbeing and her future.  He believes that if he is not reliably present in her life, she could end up being a statistic. *Id.*

61.     Mr. Bedford believes that his daughter is depressed as a result of his inability to spend time with her.  She has told him that she thinks she is going to have to get a new daddy even though she does not want a new one.  *Id.*

## IV.     Missouri's Family Support Division Traps Impoverished Parents in a Cycle of Poverty

### A.     Defendants Suspend the Licenses of Non-Custodial Parents Who Fail to Pay Child Support, Even Those Who Are Unable to Pay

62.     Under MO Rev. Stat. § 454.1003.1(1), the FSD director has the authority to issue an order suspending the driver's license of any person who "is not making child support payments in accordance with a support order and owes an arrearage in an amount greater than or equal to three months support payments or two thousand five hundred dollars, whichever is less, as of the date of service of a notice of intent to suspend such license."

63.     In cases in which the custodial parent is receiving some sort of assistance from the Office of Child Support Enforcement, which may include establishing and enforcing a child support order ("IV-D cases"), the FSD director has the authority to issue a notice of intent to suspend a license or to request that a court issue such a notice.  MO Rev. Stat. § 454.1003.2.

64.     The notice of intent to suspend states that the individual's license "shall be suspended sixty days after service unless, within such time," the person: "(1) Pays the entire arrearage stated in the notice; (2) Enters into and complies with a payment plan approved by the court or the division; or (3) Requests a hearing before the court or the director."  MO Rev. Stat. § 454.1003.3.

65.     Parents who cannot afford to make their child support payments cannot avail themselves of the first option for avoiding suspension because, under 454.1003.1(1), the total arrearage is at least three months' payments or $2,500 — both minimums, and both insurmountable costs for those who are not even able to make their monthly payments.

66.     The payment plan referenced in the second option for avoiding suspension is not guaranteed to be affordable for the individual.  In fact, when Mr. Wright called FSD to inquire about this option, he was told that the only monthly payment amount that would avoid suspension was his regular court-ordered amount of $509, which he is unable to afford.  Ex. 1, Wright Decl.

67.     The final option for avoiding suspension is to request a hearing before the court or director.  But for parents who are facing license suspension because of past-due child support, the only issues that may be addressed in this hearing are whether the parent is the correct person; whether the amount of the parent's past-due support is greater than or equal to three months of support payments or $2,500, whichever is less, by the date of service of the notice; and whether the parent entered into a payment agreement.  That is, the hearing specifically precludes any opportunity for an individual to contest suspension based on inability to make child support payments.

68.     Administrative law judges do not allow any testimony regarding inability to pay, financial hardship, disabilities, homelessness, or any other mitigating circumstances other than a mistake having been made in the financial calculation at the hearing.  Ex. 6, Lummus Decl. Lawyers who try to introduce this type of evidence are routinely informed that it is not permitted. *Id.*

69.     Defendants therefore suspend the driver's licenses of non-custodial parents who fail to pay child support once their arrears reach three months' worth or $2,500, without any exception for those whose failure to pay was non-willful and caused only by inability to pay.

**B.      Once Defendants Suspend a Parent's License for Unpaid Child Support, It Is Very Difficult to Obtain Reinstatement, even if the Parent Manages to Start Making Regular Payments**

70.     Once Defendants suspend a parent's license for unpaid child support, it is very difficult to obtain reinstatement, even if the parent manages to start making regular payments.

14

71.     Missouri law does not mandate reinstatement of a parent's license unless and until "a court or the division determines that an arrearage has been paid in full."  MO Rev Stat § 454.1013.1.

72.     FSD ostensibly offers stays on suspensions to parents who begin to make timely payments according to their current child support order and toward any arrears owed.  Ex. 6, Lummus Decl.  But for parents who cannot afford their regular payments, the stay option is of little use.

73.     Moreover, the process for obtaining a stay is onerous, opaque, and inconsistent. Lawyers attempting to obtain stays on suspensions for their clients who owe unpaid child support often do not receive replies when they submit requests to FSD, and FSD agents often insist that they are not familiar with the stay process when lawyers place phone calls to check on the status of their requests.  *Id.*  Thus, once a license is suspended for unpaid child support, obtaining a stay on the suspension is not guaranteed even for a parent who manages to start scraping together regular payments.  The success of the request hangs on the person who happens to answer the phone that day at FSD.  *Id.*

74.     Even if a parent does manage to obtain a stay on the suspension, FSD will remove the stay immediately if the payments lapse or lag, which often happens when parents are struggling enough financially that they fell behind in the first instance.  *Id.*  On information and belief, there is no notice sent to parents when a stay is removed.  *Id.*

75.     Once a parent manages to secure a job and begin paying regular support, the path toward driver's license reinstatement through FSD can be impossible to navigate with or without an attorney.  *Id.*

76.     Although FSD claims to have a reinstatement process, it is, in practice, entirely without clear process, clear guidelines, or communication.  The process is generally a formality without real function or relief.  *Id.*

77.     Even experienced attorneys attempting to navigate the reinstatement process have no clear idea as to how it is supposed to work.  *Id.*

78.     Moreover, FSD refuses to consistently copy an attorney of record on any correspondence or any centralized intake point for addressing this issue.  *Id.*

79.     Attorneys make in-person visits to the child support offices, file certified petitions with official offices in Jefferson City, request hearings they know are fruitless, and spend countless hours on the phone, fax, and email attempting to navigate this process to no avail.  *Id.*

80.     It is practically impossible for a pro se petitioner to navigate the reinstatement process.  *Id.*

81.     Most suspensions for nonpayment of child support last years or even decades due to the cycle of poverty as well as the lack of any clear path to reinstating a driver's license even after payments are being made.  *Id.*

**C.     License Suspension Drives Parents Further into Poverty and Invites Further Infractions**

82.     Usually, driver's license suspension is the first ramification that noncustodial parents face for falling behind on their payments.  Ex. 6, Lummus Decl.  Once parents lose their driver's licenses, they are more likely to become ensnared in the criminal courts.  *Id.*

83.     These suspensions leave effects that are widespread and devastating, perpetuating a cycle of poverty and despair and further breaking apart vulnerable families.  *Id.*

84.     Indigent parents with suspended licenses face an impossible choice: If they stop driving, they may lose their jobs, be unable to visit or help care for their children, not be able to

keep appointments with doctors or service providers, miss court appearances, and innumerable other potential consequences.  If they keep driving, they face the risk of being caught driving on a suspended license.

### i. Living Without a Driver's License Is Extremely Difficult, Especially in a State Like Missouri

85.     Living without being able to drive legally is extremely difficult.

86.     FSD's punitive suspension scheme imposes significant hardship on indigent non-custodial parents and their families.

87.     Once parents' licenses are suspended, their socioeconomic circumstances devolve. Ex. 6, Lummus Decl.

88.     Many parents cannot make their child support payments because doing so would leave them unable to pay for basic essentials like food and shelter.

89.     Many parents cannot make their child support payments because they have been forced into extreme financial hardship by health care expenses.

90.     Once parents have reached the point at which their arrears are high enough to trigger suspension orders, the amounts they need to pay to get their licenses reinstated are astronomically high for people already scraping by.

91.     Not having a valid driver's license bars people from employment opportunities. "Not all jobs require a driver's license, particularly those that pay very low wages. But having one is a very common requirement for the sorts of job that can actually lift people out of poverty." Alana Semuels, *No Driver's License, No Job*, The Atlantic (June 15, 2016).[4]

---

[4]   *Available at* https://www.theatlantic.com/business/archive/2016/06/no-drivers-license-no-job/486653/.

17

92.     Indeed, a rigorous study of New Jersey drivers found that 42% of drivers lost their jobs after their driver's licenses were suspended.  Driver's License Suspensions, Impacts and Fairness Study, at 56.[5]

93.     Of those drivers, 45% were unable to find new employment.  *Id.*

94.     Of those that were able to find another job, 88% reported a decrease in income.  *Id.*

95.     This trend holds true in Missouri, where parents with suspended licenses are not able to drive to work or apply for many jobs.  Ex. 6, Lummus Decl.

96.     It is extremely difficult to get from place to place in Missouri without a car.

97.     There are few options for public transportation, especially in the rural parts of the state.

98.     Parents who cannot drive are cut off from any job opportunities in neighboring counties, including St. Charles, Jefferson County, Franklin County, and parts of Illinois.  Ex. 6, Lummus Decl.

99.     Even if a parent is only traveling within the city of St. Louis, public transportation adds two additional travel hours one way (four hours per day).  *Id.*

100.    Missouri's geography does not lend itself to supporting a mass public transportation system.  *See Missouri Commuters and Means of Transportation*, Missouri Census Data Center (May 20, 2015) (". . . Missouri simply does not have the same potential for the use of public transportation networks that the smaller, more urbanized states of the Northeast do. . .").[6]

101.    While Missouri's most developed cities have their own public transportation systems, for those who live outside the big cities, there are only two services that provide

---

[5] *Available at* https://www.nj.gov/transportation/refdata/research/reports/FHWA-NJ-2007-020-V1.pdf.
[6] https://census.missouri.edu/missouri-commuters/ (last visited Jan. 24, 2019).

transportation in rural Missouri: OATS Transit and SMTS.  OATS picks its customers up at their homes.  *How to Ride OATS Transit*, OATS Transit.[7]  However, to take advantage of this service, OATS customers have to call up to ten days in advance to schedule a ride.  *Id.*  And SMTS only provides medical transportation for people who need to get to medical appointments.  *See Services*, SMTS Anyone Can Ride.[8]

102.    The overwhelming majority of Missourians drive to work.  In 2015, 87% of them commuted to work by car.  *Missouri Commuters and Means of Transportation*, Missouri Census Data Center (May 20, 2015).[9]  The 2017 American Community Survey reported that a Missourian's average commute to work takes 47.7 minutes.  *See Means of Transportation To Work By Selected Categories of Workplace Geography*, American Fact Finder U.S. Census Bureau.[10]

103.    In many cases, FSD's punitive suspension scheme forces parents with suspended licenses to choose between driving illegally and losing their jobs.

104.    Once a parent's livelihood disappears, eviction and homelessness soon follow.  Ex. 6, Lummus Decl.

105.    Because driving on a suspended license is a misdemeanor (and can be a felony on the fourth or subsequent offense), FSD's suspension scheme creates a downward spiral from poverty to criminal culpability: unpaid child support leads to suspension, which often leads to the offense of driving without a valid license.

      **ii.    Driving with a Suspended License Is a Misdemeanor Punishable with Fines and Jail Time**

---

[7] https://www.oatstransit.org/ride (last visited Jan. 24, 2019).

[8] http://ridesmts.org/services/ (last visited Jan. 24, 2019).

[9] https://census.missouri.edu/missouri-commuters/ (last visited Feb. 8, 2019).

[10] https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_17_5Y R_S0804&prodType=table. (last visited Jan. 18, 2019).

106.    Under MO Rev. Stat. § 302.321.1, "A person commits the offense of driving while revoked if such person operates a motor vehicle on a highway when such person's license or driving privilege has been cancelled, suspended, or revoked under the laws of this state or any other state and acts with criminal negligence with respect to knowledge of the fact that such person's driving privilege has been cancelled, suspended, or revoked."

107.    "Any person convicted of driving while revoked is guilty of a misdemeanor.  A first violation of this section shall be punishable as a class D misdemeanor.  A second or third violation of this section shall be punishable as a class A misdemeanor."  MO Rev. Stat. § 302.321.2.

108.    A person who is caught driving on a suspended license and is convicted for the first time is guilty of a class D misdemeanor, which is punishable by a fine of up to $500.  *Id.*; MO Rev. Stat. § 558.002.1(5).

109.    A person who is caught driving on a suspended license and is convicted for the second or third time is guilty of a class A misdemeanor, which is punishable by a fine of up to $2,000 and up to one year in jail.  MO Rev. Stat. §§ 302.321.2, 558.002.1(2), 558.011.1(6).

110.    A person who is caught driving on a suspended license and is convicted for the fourth or subsequent time can be guilty of a class E felony if the previous three offenses occurred within ten years of the most recent offense.  MO Rev. Stat. § 302.321.2.  A class E felony is punishable by a fine of up to $10,000 and a prison sentence of up to four years.  MO Rev. Stat. §§ 558.002.1(1), 558.011.1(5).

111.    The statute contains no exception for situations in which driving is a necessity.

### iii.    Failure to Pay Child Support Is a Criminalized Offense in Itself

112.    Noncustodial parents who cannot afford to make their child support payments are already criminalized under Missouri law.  MO Rev. Stat. § 568.040.

20

113.    Under MO Rev. Stat. § 568.040(1), "[A] parent commits the offense of nonsupport if such parent knowingly fails to provide adequate support which such parent is legally obligated to provide for his or her child or stepchild who is not otherwise emancipated by operation of law." The statute contains no exception for parents whose failure to pay child support is due to inability to pay.

114.    "The offense of criminal nonsupport is a class A misdemeanor, unless the total arrearage is in excess of an aggregate of twelve monthly payments due under any order of support issued by any court of competent jurisdiction or any authorized administrative agency, in which case it is a class E felony."  MO Rev. Stat. § 568.040(5).

115.    A class A misdemeanor is punishable by a fine of up to $2,000 and up to one year in jail.  MO Rev. Stat. §§ 558.002.1(2), 558.011.1(6).

116.    A class E felony is punishable by a fine of up to $10,000 and a prison sentence of up to four years.  MO Rev. Stat. §§ 558.002.1(1), 558.011.1(5).

117.    When parents have criminal convictions for falling behind on child support payments, the courts and state agencies task them with finding employment and reliable transportation in addition to paying back any child support arrearages they owe — meanwhile, FSD hamstrings their ability to complete these tasks by suspending their driver's licenses.  Ex. 6, Lummus Decl.

118.    Therefore, because nonpayment of child support itself is a criminal offense, even a felony in some cases, noncustodial parents who cannot afford their child support payments already face unavoidable criminal charges and fines, and driver's license suspension only compounds this dangerous downward spiral into further poverty and further entanglement with the criminal justice system.

V.     **FSD's Punitive Suspensions Violate Plaintiffs' Equal Protection and Due Process Rights**

119.    Defendants' indefinite suspension of non-custodial parents' driver's licenses because of their inability to pay child support violates their constitutional rights under the Equal Protection and Due Process Clauses.

A.     **Defendants' Punitive Suspension Scheme Violates Equal Protection and Substantive Due Process Because It Discriminates on the Basis of Wealth**

120.    Defendants suspend parents' driver's licenses as punishment for their failure to pay, and punishing people for failing to make payments that they cannot afford to pay is wealth-based discrimination.  *See, e.g.*, *Bearden v. Georgia*, 461 U.S. 660, 660 (1983) (holding that it discriminates on the basis of wealth to revoke probation because a probationer is unable to pay fines and restitution); *see also Griffin v. Illinois*, 351 U.S. 12, 18 (1956) (holding that it discriminates on the basis of wealth to deny access to an appeal solely because of inability to pay court costs); *Tate v. Short*, 401 U.S. 395, 395 (1971) (holding that it discriminates on the basis of wealth to jail a person for inability to pay a fine); *Williams v. Illinois*, 399 U.S. 235, 240–41 (1970) (holding that it discriminates on the basis of wealth to imprison a person beyond the maximum period fixed by statute solely because he cannot pay fines or court costs).

121.    Defendants suspend driver's licenses without first determining whether the nonpayment was willful or whether the parent was simply too poor to pay.

122.    Thus, FSD's punitive suspension scheme inevitably results in individuals being punished for their inability to pay.

123.    Punishing a person solely for his or her inability to pay constitutes wealth-based discrimination in violation of equal protection and due process.

124.    FSD's punitive suspension scheme is not rationally related to any legitimate government objective because suspending driver's licenses impedes indigent parents from

obtaining or maintaining employment in order to meet their financial obligations and also impedes their ability to participate actively in parenting their children.

125.    Driver's licenses are often essential in the pursuit of a livelihood, and their suspension threatens important interests of the people who hold them.

126.    License suspension is counterproductive to FSD's interests in collecting unpaid child support from indigent parents because it prevents such parents from working and can cost them additional expenses in the form of fines for driving on a suspended license.

127.    For indigent parents, avoiding driver's license suspension does not operate as an incentive to pay child support.  Most people will do whatever it takes to make sure their children are cared for; if they owe enough unpaid child support that they are facing license suspension, it is only because they cannot afford to pay it.  And when parents must choose between paying arrears and paying rent, buying medication, feeding their families, and other necessary expenses, they cannot prioritize arrears.

128.    For parents who cannot pay, coercing payment by license suspension is irrational and counterproductive; suspension makes it less likely — rather than more likely — that people will be able to pay child support.

129.    The loss of a license often means the loss of reliable transportation to and from work, which makes parents less able to meet their child support obligations.

130.    Suspending driver's licenses — especially for people who are poor — causes unemployment and homelessness and thus exacerbates a cycle of poverty.

131.    License suspension is also counterproductive to the best interests of the children of parents with unpaid child support because when they cannot drive, they cannot visit their children,

drive them to school, drive them to the doctor, or otherwise engage in the everyday caretaking responsibilities of being a parent.

132.   In many cases, the noncustodial parents' resultant inability to participate in childcare responsibilities and visitation leads to a breakdown in family dynamics, as custodial parents begin to resent the noncustodial parents' perceived failures and lack of reliability.  Ex. 6, Lummus Decl.  A custodial parent may even conclude that the noncustodial parent is not fit to be an involved parent due to their diminished income capacity and lack of mobility, which can significantly harm a noncustodial parent's relationship with the children.  *Id.*  It is not uncommon for the custodial parent to deny visitation based on the non-custodial parent's lack of transportation or dependency on public transportation.  *Id.*

**B.    Defendants' Punitive Suspension Scheme Violates Equal Protection Because It Discriminates on the Basis of Wealth Without Being Narrowly Tailored to a Compelling Government Interest**

133.   Although poverty is usually not a suspect class, in this case, Defendants' enforcement of failure-to-pay suspensions is subject to heightened scrutiny because indigent parents are completely unable to pay their arrears, and license suspension completely deprives them of their ability to drive legally.  *See San Antonio School District v. Rodriguez*, 411 U.S. 1, 93 (1973).  Therefore, because Defendants' punitive suspensions are not narrowly tailored to the collection of child support or the best interests of children, they are unconstitutional.

134.   Plaintiffs' poverty renders them completely unable to pay off their arrears to reinstate their licenses.  It is not the case that the cost of paying the debt is "great, but not insurmountable," nor are Plaintiffs "persons with relatively less money on whom designated fines impose heavier burdens."  *San Antonio*, 411 U.S. at 21–22.  Rather, Plaintiffs are completely unable to pay.  Plaintiffs have not managed to pay off their arrears and get their licenses reinstated

because they cannot do so without foregoing basic life necessities; that is, they are completely unable to pay the amount required.

135.    FSD's imposition of driver's license suspensions against indigent parents like Plaintiffs constitutes an absolute deprivation of the ability to drive.  Plaintiffs have no option that allows them to drive legally while their licenses are suspended, and their suspensions were the result of a complete inability to satisfy their child support obligations.  Thus, this case is one in which poverty is a suspect class.

136.    Since this case falls into the exception in which poverty is a suspect class, the FSD's suspensions violate equal protection because they are not "narrowly tailored to serve a compelling government interest." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 219 (1995).

137.    For parents who are indigent, failure-to-pay suspensions are not even rationally related to the state interest of child support collection because they are actually counterproductive, causing parents to lose income.

138.    Nor are suspensions narrowly tailored, or even rationally related, to the goal of protecting the best interests of Missouri's children, since license suspension makes noncustodial parents less available to their children and often directly impedes parent-child relationships.

**C.    Defendants' Punitive Suspension Scheme Violates Substantive Due Process Because It Infringes on Plaintiffs' Fundamental Right to Travel**

139.    Plaintiffs have a fundamental due process right to travel.  *See, e.g.*, *Saenz v. Roe*, 526 U.S. 489 (1999).  Although there is no fundamental right to drive, the Supreme Court has guaranteed freedom of movement to people who are poor as well as to the rich.  Allowing states to limit the movement of those who are indigent "would also introduce a caste system utterly incompatible with the spirit of our system of government."  *Edwards v. People of State of California*, 314 U.S. 160, 181 (1941) (Douglas, J., concurring).

25

140.    While the Eighth Circuit has not ruled definitively on the issue, other circuits have specifically recognized a fundamental right to intrastate travel.  *See, e.g.*, *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971); *see also Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002).

141.    Because their licenses are suspended, Plaintiffs cannot travel on Missouri's roadways without risking criminal consequences.

142.    Plaintiffs' suspensions are therefore an "actual barrier to intrastate movement." *Weems v. Little Rock Police Dept.*, 453 F.3d 1010, 1016 (8th Cir. 2006).

143.    Plaintiff Wright in particular lives in a rural area where public transportation options are extremely limited.

144.    Plaintiff Bedford must rely on the bus for transportation, and he is often unable to afford a bus pass.  Ex. 3, Bedford Decl.

145.    Plaintiffs cannot afford to pay for taxis or other car services for daily commuting and living.

146.    Defendants have suspended Plaintiffs' licenses simply because they are unable to pay their debts and therefore have impeded their fundamental right to intrastate travel.

147.    Because it implicates a fundamental liberty interest, Defendants' suspension scheme must be narrowly tailored to achieve compelling state objectives.

148.    Defendants' suspension scheme is not limited in scope; it is a broad prohibition on all driving in all locations at all times in all circumstances for an indefinite period.

149.    While the collection of child support is a significant state interest, suspending the driver's licenses of parents who cannot pay is not narrowly tailored to collection.  Indeed, it is

counterproductive because it hampers Plaintiffs' ability to make a living and pay their essential expenses, thus decreasing their ability to pay court debts.

> **D.    Defendants' Punitive Suspension Scheme Violates Procedural Due Process Because It Does Not Guarantee an Ability-to-Pay Hearing or Provide Notice of Such a Hearing**

150.    A person's driver's license is recognized as a property interest that may not be taken away without due process of law. *Bell v. Burson*, 402 U.S. 535 (1971). Due process requires the state of Missouri to conduct pre-deprivation ability-to-pay hearings and to provide notice that such hearings are available.

151.    The pre-deprivation hearing must contemplate ability to pay. Because Defendants suspend parents' driver's licenses due to their failure to pay (child support), a meaningful hearing in this context is one that determines whether the nonpayment was willful, since parents' willfulness speaks directly to their liability for the failure to pay.

152.    The ability-to-pay hearing must be available before suspension takes effect. The purpose of FSD's punitive suspension scheme is to coerce payment and to punish, not to get dangerous drivers off the road. Therefore, there is no urgent safety need calling for immediate suspension, and Plaintiffs and others similarly situated are entitled to an ability-to-pay hearing prior to license suspension.

153.    Missouri law does not currently guarantee or even allow a pre-deprivation ability-to-pay hearing for parents facing suspension due to unpaid child support. The only hearing that is available is one specifically limited to ensuring that no errors were made in the calculations. Ex. 6, Lummus Decl. Administrative law judges will not allow any testimony concerning inability to pay at these hearings. *Id.*

154.    Due process also requires that all parents facing suspension for unpaid child support receive adequate notice that a pre-deprivation hearing is available and that they can raise inability to pay as a defense at that hearing.

155.    Prior to suspending a parent's driver's license for unpaid child support, FSD does not provide any notice informing the parent of any right to an ability-to-pay hearing.  In fact, parents are specifically informed that they cannot raise inability to pay as a defense.

156.    Moreover, FSD does not independently review the parent's ability to pay before or after ordering the harsh punishment of suspension.  Thus, Defendants suspend licenses without any consideration of ability to pay.

157.    Because Missouri law does not require a pre-deprivation ability-to-pay hearing for parents facing driver's license suspension for unpaid child support, there is a high risk that indigent parents will be deprived of their driver's licenses for reasons directly attributable to their poverty.

### Class Action Allegations

158.    Named Plaintiffs Nathan Wright and Camese Bedford bring this action, on behalf of themselves and all others similarly situated, to assert the claims alleged in this Amended Complaint on a common basis.

159.    A class action is a superior means, and the only practicable means, by which named Plaintiffs and unknown Class Members can challenge Defendants' unlawful punitive suspension scheme.

160.    This action is brought and may properly be maintained as a class action pursuant to Rule 23(a)(l)–(4) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

161.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

162.    Plaintiffs propose a declaratory and injunctive class defined as: All individuals whose Missouri driver's licenses are, or will be, suspended for failure to pay child support under MO Rev. Stat. § 454.1003 and whose reason for nonpayment was, or will be, inability to pay.

## I.    Numerosity — Fed. R. Civ. P. 23(a)(1)

163.    Class Members are so numerous as to make joinder impracticable.  This is a statewide Class that includes all parents whose licenses are currently suspended because of their inability to pay child support as well as all parents who will suffer such suspension during the pendency of this lawsuit.

164.    In 2018 alone, Class counsel litigated the cases of 39 parents in whose licenses were suspended due to their inability to make their child support payments.  Moreover, Class counsel's St. Louis office receives five to ten requests every month for assistance with this issue, and the office receives many more requests from affected parents throughout the state of Missouri.

165.    Named Plaintiffs' inclusion of future Class Members in their Class definition also makes joinder impracticable.

166.    Named Plaintiffs conservatively estimate that tens of thousands of Missouri parents currently have suspended driver's licenses because they cannot afford to make their child support payments.

## II.    Commonality — Fed. R. Civ. P. 23(a)(2)

167.    The relief sought is common to all Class Members, and common questions of law and fact exist as to all Class Members.  Named Plaintiffs seek relief concerning whether FSD's suspension scheme violates the rights of Class Members, and they seek relief mandating that Defendants end the scheme so that the constitutional rights of Class Members will be protected in the future.

168.    These common legal and factual questions arise from one scheme: Defendants' driver's license suspensions based on inability to pay child support. The material requirements of the relevant statutes do not vary from Class Member to Class Member, and the resolution of these legal and factual issues will determine whether all Class Members are entitled to the relief they seek.

169.    Among the most important, but not the only, common questions of fact are:

- Whether FSD has a policy and practice of using driver's license suspension to coerce child support payments from non-custodial parents who are unable to pay;
- Whether FSD has a policy and practice of suspending driver's licenses without conducting meaningful inquiries into a person's ability to pay before taking such action; and
- Whether FSD's policy and practice of using driver's license suspension to coerce child support payments is in fact counterproductive.

170.    Among the most important, but not the only, common questions of law are:

- Whether fundamental principles of due process and equal protection require FSD to take into account a parent's ability to pay before suspending a license for nonpayment of child support;
- Whether suspending a parent's driver's license solely because she or he cannot afford to make child support payments is lawful; and
- Whether a person is entitled to a meaningful inquiry into his or her present ability to pay child support before Defendants suspend his or her license for nonpayment.

## III.    Typicality — Fed. R. Civ. P. 23(a)(3)

171.    Named Plaintiffs' claims are typical of the other Class Members' claims, and they have the same interests in this case as all other Class Members.  Each Class Member has had or will have his or her driver's license suspended due to an inability to pay child support.  The answer to whether Defendants' punitive suspension scheme is unconstitutional will determine the claims of Named Plaintiffs and every other Class Member.

172.    If Named Plaintiffs succeed in the claim that FSD's policies and practices concerning driver's license suspensions violate their constitutional rights, that ruling will likewise benefit every other Class Member.

### IV.    Adequacy — Fed. R. Civ. P. 23(a)(4)

173.    Named Plaintiffs are adequate representatives of the Class because their interests in the vindication of the legal claims that they raise are entirely aligned with the interests of the other Class Members, who each have the same basic constitutional claims.  They are members of the Class, and their interests coincide with, and are not antagonistic to, those of the other Class Members.

174.    There are no known conflicts of interest among Class Members, all of whom have a similar interest in vindicating their constitutional rights in the face of Defendants' punitive suspension scheme.

175.    Plaintiffs are represented by attorneys from Equal Justice Under Law and St. Francis Community Services, who have experience in litigating complex civil rights matters in federal court and extensive knowledge of both the details of Defendants' scheme and the relevant constitutional and statutory law.

176.    The combined efforts of Class counsel have so far included extensive investigation into Defendants' suspension scheme, including interviewing attorneys in the region, statewide experts in the functioning of state and local courts, and national experts in constitutional law, law enforcement, judicial procedures, and criminal law.

177.    Class counsel have a detailed understanding of local law and practices as they relate to federal constitutional requirements.

178.    As a result, counsel have devoted enormous time and resources to becoming intimately familiar with Defendants' scheme and with the relevant state and federal laws.  The

interests of the Class Members will be fairly and adequately protected by Named Plaintiffs and their attorneys.

## V.      Rule 23(b)(2)

179.    Class action status is appropriate because Defendants have acted or will act in the same unconstitutional manner with respect to all Class Members.  Defendants enforce a punitive suspension scheme: indigent non-custodial parents who are unable to pay child support are punished with license suspension, which only renders them less able to pay.

180.    The Class therefore seeks declaratory and injunctive relief to enjoin Defendants from ordering and enforcing these suspensions.  Because the putative Class challenges Defendants' scheme as unconstitutional through declaratory and injunctive relief that would apply the same relief to every Class Member, Rule 23(b)(2) certification is appropriate and necessary.

181.    Injunctive relief compelling Defendants to comply with these constitutional rights will similarly protect each Class Member from being subjected to Defendants' unlawful policies and practices.  A declaration and injunction stating that Defendants cannot order driver's license suspensions for people who are unable to pay child support would provide relief to every Class Member.  Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

### Claims for Relief

### Count One:
### Violation of Equal Protection and Fundamental Fairness under *Bearden v. Georgia* (Facial Challenge)

182.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

183.    Missouri's statutory scheme authorizing Defendants to suspend parents' driver's licenses for unpaid child support violates equal protection and substantive due process because it discriminates on the basis of wealth in a way that is fundamentally unfair.

184.    The Fourteenth Amendment's Due Process Clause requires that Missouri maintain a standard of fundamental fairness in its justice system.  The suspensions authorized by MO Rev. Stat. § 454.1003.1(1) punish people simply for being too poor to pay, which violates the principles of equal protection and due process because it amounts to discrimination on the basis of wealth.

185.    MO Rev. Stat. § 454.1003.1(1) authorizes FSD to order driver's license suspensions for non-custodial parents who are not making payments on their child support obligations and who owe arrears greater than or equal to three months' payments or $2,500, whichever is less.  The statute does not guarantee or even contemplate any exception for parents whose nonpayment was not willful.

186.    MO Rev. Stat. § 454.1003.1(1) is therefore an ostensibly neutral law that nevertheless discriminates on the basis of wealth because it authorizes a penalty for failure to pay without any exception for those who are unable to pay.

### Count Two:
### Violation of Equal Protection and Fundamental Fairness under *Bearden v. Georgia*
### (As-Applied Challenge)

187.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

188.    Defendants violate equal protection and substantive due process by suspending parents' driver licenses for inability to pay child support because they discriminate on the basis of wealth in a way that is fundamentally unfair.

33

189.     Defendants' suspensions for inability to pay child support punish parents simply for being too poor to pay, which violates the principles of equal protection and due process because it discriminates on the basis of wealth.

190.     FSD orders driver's license suspensions for failure to pay child support without providing any exception for those whose failure to pay was non-willful.  Defendants' suspension scheme is therefore an ostensibly neutral practice that nevertheless discriminates on the basis of wealth because it imposes a penalty for failure to pay without any exception for those who are unable to pay.

**Count Three:**
**Violation of Equal Protection under *San Antonio School District v. Rodriguez***
**(As-Applied Challenge)**

191.     Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

192.     Defendants' wealth-based discrimination is subject to heightened scrutiny because indigent parents are completely unable to pay their arrears, and license suspension completely deprives them of their ability to drive legally.

193.     Therefore, Defendants' suspension scheme must be narrowly tailored to a compelling state interest to pass constitutional muster.

194.     Defendants' punitive suspensions are not narrowly tailored to the collection of child support because driver's license suspensions make already-struggling parents less able to pay child support, as parents often suffer job loss, income reduction, eviction, and further criminal fines as a result of not being able to drive legally.

195.     Defendants' punitive suspensions are not narrowly tailored to the best interests of children because a parent with a suspended driver's license is not only less able to earn money to

pay child support, but also less able to participate in the lives of his or her children.  Parents with suspended licenses have a more difficult time picking their children up for visitation, attending school functions, and generally participating in parenting responsibilities.  This often leads to further disintegration of already-fragile family relationships, which directly harms children.

196.    Because Defendants' suspension scheme is not narrowly tailored to any compelling government interest, it violates equal protection rights.

### Count Four:
### Violation of Fundamental Right to Travel

197.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

198.    Plaintiffs and others similarly situated have a fundamental right to travel.  Because Class Members have no viable alternative to driving, Defendants' suspension of their licenses implicates their rights to interstate and intrastate travel, and this suspension is not narrowly tailored to meet the state objective of child support collection.

### Count Five:
### Violation of Procedural Due Process
### (Facial Challenge)

199.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

200.    The statutory scheme that authorizes Defendants to suspend driver's licenses for failure to pay child support violates procedural due process because it does not guarantee an ability-to-pay hearing or provide that notice of such a hearing be provided.

201.    Plaintiffs and others similarly situated have protected property and liberty interests in their driver's licenses and their ability to drive legally.

202.     Parents are constitutionally entitled to a meaningful hearing (that is, an ability-to-pay hearing) and notice of that hearing before Defendants may suspend their driver's licenses for failure to pay child support.

203.     Missouri's statutory scheme authorizes the deprivation of this property interest without adequate due process because it does not guarantee an ability-to-pay hearing for all parents facing suspension, and it does not mandate that all such parents be notified of their right to assert ability to pay as a defense.

**Count Six:**
**Violation of Procedural Due Process**
**(As-Applied Challenge)**

204.     Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

205.     Defendants violate procedural due process rights under the United States Constitution by suspending licenses without first considering whether nonpayment was willful and without providing adequate notice to parents facing suspension that they may raise inability to pay as a defense against the suspension action.

206.     FSD does not inform parents that they may assert inability to pay as a defense against suspension.  In fact, the only hearing that FSD provides is one in which parents are specifically prohibited from raising inability to pay or presenting their financial situations in any way.  Therefore, Defendants are suspending parents' driver's licenses without adequate due process.

**<u>Requested Relief</u>**

WHEREFORE, Plaintiffs request that the Court issue the following relief:

a.     A declaratory judgment that Defendants' policies, practices, acts, and/or omissions as described herein are unlawful and violate Plaintiffs' and Class Members' rights under the Constitution and laws of the United States;

b.      An order and judgment preliminarily and permanently enjoining Defendants, their subordinates, agents, employees, representatives, and all others acting or purporting to act in concert with them or on their behalf from issuing or processing orders of driver's license suspensions for unpaid child support arrears against Plaintiffs and Class Members until such time as the State of Missouri implements a system that complies with the United States Constitution;

c.      An order and judgment preliminarily and permanently ordering Defendants to reinstate Plaintiffs' and Class Members' driver's licenses (insofar as they are suspended based on unpaid child support arrears);

d.      An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other relief this Court deems proper.

Respectfully submitted,

*/s/ Rebecca Ramaswamy*
Rebecca Ramaswamy (5403415NY)
Phil Telfeyan (1029157DC)
Attorneys, Equal Justice Under Law
400 7th Street NW, Suite 602
Washington, D.C. 20004
(202) 505-2058
rramaswamy@equaljusticeunderlaw.org
ptelfeyan@equaljusticeunderlaw.org

*/s/ Stephanie Lummus*
Stephanie Lummus (64999MO)
Attorney, St. Francis Community Services
100 N. Tucker Blvd., Suite 726
St. Louis, MO 63101
(314) 977-5452
stephanie.lummus@slu.edu